**CALIFORNIA FIRST AMENDMENT COALITION and Society of Professional Journalists, Northern California Chapter, Plaintiffs,**

v.

**Arthur CALDERON, Warden of San Quentin State Prison and James H. Gomez, Director of the California Department of Corrections, Defendants.**

No. C–96–1291–VRW.

United States District Court, N.D. California.

Jan. 28, 2000.

Alan L. Schlosser, Kelli Evans, American Civil Liberties Union Foundation of Northern CA Inc., San Francisco, CA, Jeffrey S. Ross, Pillsbury Madison & Sutro LLP, San Francisco, CA, Michael J. Kass, Jill Hersh, Friedman Ross & Hersh, P.C., San Francisco, CA, Lynne S. Coffin, Coffin & Love, San Francisco, CA, David M. Fried, Law Office of David Fried, San Francisco, CA, for plaintiffs.

Karl S. Mayer, State Atty. General's Office, San Francisco, CA, for Arthur Calderon, James Gomez, defendants.

Susan Duncan Lee, Ronald E. Niver, Bill Lockyer, David P. Druliner, State Atty. General's Office, San Francisco, CA, for Jeanne Woodford, Cal Terhune, defendants.

## ORDER.

WALKER, District Judge.

Following the execution of William George Bonin in February of 1996, plaintiffs initiated this action seeking to enjoin defendants to allow witnesses of executions to view earlier stages of the execution process than were then permitted. At the Bonin execution, the witnesses were only permitted to view the proceedings after Bonin had already been strapped to the gurney and intravenous tubes had been inserted into his arms. The witnesses did not hear the execution order and could not perceive the point at which the lethal compounds began entering Bonin's body. Plaintiffs contend that the First Amendment and California law compel defendants to allow witnesses to view a more substantial portion of the execution process.

Defendants' policy, Procedure 770, allows for observation only after the condemned inmate is strapped down and the IV shunt has been inserted. Plaintiffs seek to view the execution from the moment the condemned inmate enters the execution chamber. This would entail an estimated additional five to twenty minutes of observation time. This court granted plaintiffs' motion for a preliminary injunction and ultimately granted a permanent injunction on summary judgment. *California First Amendment Coalition v. Calderon*, 956 F.Supp. 883 (N.D.Cal.1997) (*"Calderon I"*). The court ordered defendants to allow witnesses to "view the procedure at least from the point in time just prior to the condemned being immobilized, that is strapped to the gurney or other apparatus of death, until the point in time just after the prisoner dies." Id. at 890. During the period in which the preliminary injunction was in force, California executed Keith Daniel Williams without incident.

Defendants appealed the court's order. At first, the court of appeals reversed and ordered this court to enter judgment in favor of the defendants. *California First Amendment Coalition v. Calderon*, 138 F.3d 1298 (9th Cir.1998). Subsequently, the court of appeals withdrew this order and replaced it with a new order that instructs this court to determine "whether the Coalition has presented 'substantial evidence' that Procedure 770 represents an exaggerated response to Calderon's security and safety concerns." *California First Amendment Coalition v. Calderon*, 150 F.3d 976 (9th Cir.1998) (*"Calderon III"*), citing *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). De-

fendant has filed a renewed motion for summary judgment. Plaintiff opposes the motion and argues that trial is necessary to resolve the factual question presented by the appeals court.

The appellate court ruled that the press possesses no heightened constitutional right to view the proceedings as compared to the right of the general public. In doing so, the appeals court invoked a line of cases limiting press access to activities within prison walls: *Pell* (upholding regulation limiting media selection of a particular inmate to interview); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) (upholding regulation prohibiting face-to-face interviews with specific inmates); *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (upholding policy of allowing media to visit prison only during scheduled tours). The appeals court rejected this court's analogy to cases recognizing First Amendment rights in "access to certain government-controlled sources of information related to the criminal justice system," such as preliminary hearings, voir dire and trials. See *Calderon I*, 956 F.Supp. at 886 and cases cited therein. The appeals court found that this court mistakenly determined that Procedure 770 implicated First Amendment access and accordingly had erred in applying the First Amendment level of scrutiny in analyzing the regulation. *See Calderon III*, 150 F.3d at 982.

The appeals court did not, however, hold that a policy restricting viewing would survive the First Amendment. Rather, the appeals court found that the current procedure would not violate the First Amendment, unless plaintiffs could show that the procedure represents an exaggerated response to the risks associated with public access to the execution process. The appeals court noted that if the state "were to attempt a greater limitation on the press' observation, we would have to revisit the issue." *Calderon III*, 150 F.3d at 982, n. 10.

In finding a First Amendment right to view executions, this court discussed both the tradition of public access to executions and the "awesomeness of the state's imposition of death as punishment." *Calderon I*, 956 F.Supp. at 886–890. The appeals court rejected this court's reasoning and stated that whether the First Amendment is called into play is not based on the "notoriety" of the underlying event. *Calderon III*, 150 F.3d at 982. With all due respect to the appeals court, this court is not alone in positing that the death penalty holds a unique status in the law. A long line of Supreme Court cases acknowledge the truism that "death is different." See, e.g. *Harmelin v. Michigan*, 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Turner v. Murray*, 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). It is not the fact that capital punishment is controversial or notorious that makes it a unique act of the state. Rather, it is the fact that only in the rarest of circumstances does the law condone the government's deliberate and premeditated infliction of severe physical injury or death on an individual.

The test the appeals court asks this court to apply, that of "substantial evidence" of an "exaggerated" response by prison officials, comes from the section of the *Pell* decision discussing the First Amendment rights of *prison inmates*, not those of the media. *Pell*, 417 U.S. at 827, 94 S.Ct. 2800. Furthermore, the court notes that the portion of the *Pell* decision which actually addresses the *media's* First Amendment rights in the prison context emphasized the many opportunities for observation that the disputed policy affords:

> We note at the outset that this regulation is not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of those conditions. Indeed, the record demonstrates that, under current corrections policy, both the press and the general public are

accorded full opportunities to observe prison corrections.

*Id.* at 830, 94 S.Ct. 2800. The same cannot be said of Procedure 770.

Plaintiffs have presented evidence that the procedure was adopted, at least in part, to prevent the viewing of certain proceedings.[1] And, more importantly, there are no alternative opportunities or channels for obtaining information about these events to reach the media and the public. The condemned inmate, the only non-government witness to potential Eighth and Fourteenth Amendment violations which precede the observation permitted by Procedure 770, cannot gain access to the media or the public from the grave.

Nonetheless, the court is now bound by the appeals court's ruling and must determine whether there is "substantial evidence" that defendants' policy is an exaggerated response to their legitimate security and safety concerns.

Defendants contend that allowing witness access in accordance with this court's prior injunction raises serious safety concerns for prison personnel. Because the witnesses would be viewing the personnel for a longer period of time, defendants fear that the witnesses would be more likely to identify the individuals who carry out executions. The defendants fear that this information would be revealed to the public and to the inmate population of the prison. This, they contend, might lead to retaliation against these individuals. Also, fear of public disclosure might deter prison personnel from participating in the executions, making it more difficult for California to carry out death sentences. Defendants also fear that execution personnel will undergo more stress as they perform their jobs if they are being watched. De-

fendants contend that no alternative exists to limiting the viewing period.

Plaintiffs contend that defendants' safety concerns are unwarranted and disingenuous. There has been, thus far, no incident in which prison employees' identities were revealed. There have been no acts of retaliation against any execution workers. In support of their attempt to demonstrate that Procedure 770 constitutes an exaggerated response, plaintiffs also point to the fact that during the Williams execution, while the court's injunction was in effect, defendants made no additional efforts to conceal the identities of the execution team. Plaintiffs argue that the additional viewing time they seek will not materially increase their likelihood of prison employee identification as compared to the viewing time allotted under Procedure 770. Plaintiffs further assert that defendants' actual motivation for the policy is to conceal difficulties that may occur during the executions. Plaintiffs present evidence that defendants' policy is motivated, at least in part, by the desire to control public perception of executions. See Plaintiff's Memorandum of Points and Authorities, Exh 1 (Calderon Deposition, 117–118) and footnote 1, supra. The successful execution that took place while the injunction was in place and defendants' own testimony that the employees are sufficiently skilled and professional to perform their tasks competently even while watched at the least raises a question whether defendants' limitation on access represents an exaggerated response to defendants' legitimate concerns. See Plaintiffs' Supplemental Exhibit in Opposition to Motion for Summary Judgment (Deposition of Warden Jeanne Woodford).

Plaintiffs contend that defendants have alternative means of concealing the identi-

---

1. See Plaintiff's Memorandum of Points and Authorities, Exh 1, Calderon Memorandum (stating one reason defendants oppose media access is that "in the event of a hostile and combative inmate, it will be necessary to use additional force and staff to subdue, escort and secure the inmate to the gurney. It is

important that we are perceived as using only the minimal amount of force necessary to accomplish the task. In reality, it may take a great deal of force. This would most certainly be misinterpreted by the media and inmate invited witnesses who don't appreciate the situation we are faced with.")

ty of the executioners. Plaintiffs suggest that the use of surgical masks and gowns is a viable alternative. Defendants insist that the use of surgical masks is not a viable option. They claim that surgical masks: (1) are ineffective as a means of concealing identity; (2) could lead to confusion on the part of the team involved in the execution and on the part of the condemned inmate; (3) could create danger by impeding employees from carrying out their job functions; (4) are demeaning and unprofessional; and (5) detract from the dignity of the proceedings.

The fourth and fifth concerns relating to professionalism and dignity are patently unrelated to any legitimate "security and safety concerns" and are thus irrelevant to the court's analysis as dictated by the appeals court. As to their first and primary concern, defendants argue that even if the execution team members wear masks, witnesses may still be able to identify their height, weight, gender, hair length, skin tone, posture and manner. Plaintiffs present evidence that masks are indeed an effective means of concealing identities, at least in the setting in which they are commonly used, a hospital operating room. See Declaration of Lonny Shavelson.

In short, plaintiffs have presented sufficient evidence to foreclose summary judgment for defendants. This conclusion does not doom defendants' position that Procedure 770 is not an exaggerated response to their legitimate concerns about safety of prison personnel and, as the court understands the court of appeals' remand order, this is an issue on which plaintiffs bear the burden of proof. This issue cannot, however, be resolved short of trial. Accordingly, defendants' motion for summary judgment is DENIED.

The parties shall appear for a pretrial conference on February 3, 2000 at 3:30 pm.

IT IS SO ORDERED.